STATE OF NORTH CAROLINA v. KENNETH MARVIN KNIGHT

No. 8819SC672

(Filed 18 April 1989)

1. **Criminal Law § 35 — wife's motive to fabricate offenses against daughters — testimony irrelevant**

In a prosecution of defendant for first degree sexual offenses involving his stepdaughters, testimony defendant sought to elicit from his wife concerning her financial motive to encourage her daughters to fabricate the sexual incidents in question was not relevant and was properly excluded where the subornation theory was not supported by evidence from other sources; the investigation into allegations of sexual abuse

was initiated by a school counselor to whom one stepdaughter confided because she felt she could not tell her mother; and the evidence against defendant included a diary in which one stepdaughter detailed the incidents of sexual abuse. Even if such evidence was relevant, it was properly excluded because its probative value was substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rules 401 and 403.

2. **Criminal Law § 82.2— psychologist-patient relationship— evidence of child sexual abuse**

Assuming that a psychologist-patient relationship existed between a clinical psychologist and defendant, testimony by the psychologist that defendant told her he had been seduced by his stepdaughter was admissible under N.C.G.S. § 8-53.3 as evidence regarding the abuse of a child.

APPEAL by defendant from *Davis, James C., Judge.* Judgment entered 5 February 1988 in Superior Court, CABARRUS County. Heard in the Court of Appeals 14 February 1989.

Defendant appeals from his conviction of first-degree sexual offense in violation of G.S. sec. 14-27.4. He was sentenced to life imprisonment.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Alan S. Hirsch, for the State.*

*H. Edward Knox and Lisa G. Caddell for defendant-appellant.*

JOHNSON, Judge.

The evidence presented by the State in this matter revealed that defendant was married to Sharon St. John Knight in 1985. At the time of the marriage, Mrs. Knight had three children from a previous marriage, one son and two daughters. Defendant was charged with two counts of first-degree sexual offense, one committed against each of the daughters. He was convicted of the charge stemming from the 19 September 1987 incident upon the older daughter (daughter number one) who was twelve years old when the crime was allegedly committed, and acquitted of the charge stemming from the 20 October 1987 incident in which the younger daughter (daughter number two), who was ten years old at the time, was the victim. For purposes of this appeal we concern ourselves primarily with the charge for which defendant was con-

victed, the first-degree sexual offense arising from the 19 September 1987 incident.

Daughter number one testified that on Saturday, 19 September 1987, at a little before noon, she went out onto the back porch of her parents' home to ask defendant if he wanted a cold drink. He responded that he wanted a pack of cigarettes and a drink. When she returned with the items she found him behind a door. After giving the items to him, he asked her to "[h]old on a second." He then told her to get on her knees and to "[s]uck my yo-yo [penis] like a lollipop." She placed his penis into her mouth and moved her head over it back and forth as she was instructed to do for a few minutes. Defendant then masturbated in front of the child and she watched as "[w]hite stuff came out" of his penis. She also testified that her brother and sister were outside playing when the incident occurred.

Daughter number one also testified in detail about prior sexual acts between herself and defendant, her stepfather. She stated that defendant would make her "jack him off" by making her "move [her] hand over his penis up and down." She did not remember precisely when these incidents occurred, although she recalled that they happened prior to the 19 September incident. He would also dress in women's underwear and have her perform fellatio or fondle his penis. He also showed daughter number one photos of himself dressed in women's underwear and handcuffed to the bed or tied.

Daughter number one also read an excerpt from her diary which was dated 16 and 17 June 1987. She read the following:

A. "He's a G.D. a-s-s hole. Instead of rubbing his dick, I rather kick him in the nuts. That'll be the day. If I had the guts I would tell him and let us go to court and testify but I just don't think I can. If I tell her," — tell Mama — "tell her, she'll tell Ken and he'll get even more madder. I hate to be dishonest to her but it's for her own good. Maybe we, me and Tracy, can go to court and get Ken punished for all the nasty things he has made us do and has done to me. Why me, or something. I'm just so D stupid. How could, how could I let this happen? Why did I have to grow us so fast? Why?"

She described her relationship with her stepfather as bad, meaning that "[h]e just never like me in any other way but — for his own advantage."

The State presented several witnesses to corroborate daughter number one's testimony. Clinton Nobles testified that on the evening of 18 September at around 11:00 he and defendant had an argument which defendant's stepchildren witnessed. Daughter number one had used this incident to pinpoint the date of the incident for which defendant was convicted. She remembered that the incident occurred after the argument on the following day.

Judith Helms, a school counselor, testified that daughter number two, a fifth grader at her school, scheduled an appointment with her for 21 October 1987. When she arrived, the student handed her a note which described the sexual acts which defendant forced her and her sister to perform, such as fellatio. She also stated in the note that she was scared "to go home in the afternoon to see what is going to happen next," that he had her perform these acts in the morning also, and that she had to tell someone older, but not someone in her family. After discussing the matter with her in greater depth, Mrs. Helms excused herself and called a social worker, Carol Renfrow of the Department of Social Services, to ask her advice as to whether she should send the child home, as well as to report the case of possible sexual abuse. This counseling session commenced the investigation into circumstances existing at the Knight home.

Faye Sultan, a clinical psychologist, also testified for the State. She stated that she began treating both the daughters and their mother on 9 November 1987. On 8 November 1987, she received a telephone call from defendant during which he made an appointment for the following week. After her initial visit with the girls and their mother, she recognized a possible conflict of interest and telephoned defendant on 10 November 1987 to suggest other treatment options. She was allowed to testify over objection that during this conversation defendant told her that "he had been seduced by his stepdaughter and that he had been stupid and that he had fallen into a trap."

Defendant testified in his own behalf that since the age of nine or ten he had gained satisfaction from wearing women's underwear. He also testified that he gained sexual pleasure in bondage, which included wearing handcuffs and being blindfolded. He stated that on 19 September 1987, the date of the incident with daughter number one, he worked on remodeling a kitchen from about 8:30 a.m. until about 7:00 or 7:30 p.m. and that he

left once during that day between 10:30 and 11:30 to go to a hardware store to purchase materials. The receipt from the hardware store bore the date of 19 September 1987 and a time of 1:05 p.m. James Rogers, the homeowner for whom defendant had worked that day, basically corroborated defendant's testimony. Defendant also denied ever having any sexual contact with either of his stepdaughters.

By this appeal defendant presents two questions for review. First, he argues that the exclusion of testimony he sought to elicit from his wife concerning her motive to encourage her daughters to fabricate the sexual incidents was error, and second, that the admission of Dr. Faye Sultan's testimony constituted an abuse of discretion.

[1]   Defendant sought to introduce testimony to support his theory that his wife devised the scheme involving her daughters in what is essentially a domestic dispute, to rid herself of defendant and to retain the "comfortable life she had come to know as the [d]efendant's wife," including the marital residence he had provided for her. Defendant relies upon *State v. Helms*, 322 N.C. 315, 367 S.E. 2d 644 (1988), to support his contention that the evidence concerning motive was relevant and should have been admitted. We are not convinced.

In *Helms*, defendant was charged with committing sexual offenses upon two of her stepsons. At trial she was not allowed to introduce evidence that approximately two weeks before the accusation of the sexual offenses was brought by the children's natural mother, defendant and her husband, along with one of the stepsons, consulted an attorney for the purpose of seeking to obtain legal custody of the boys. Our Supreme Court accepted defendant's argument that the evidence was relevant within the meaning of G.S. sec. 8C-1, Rule 401 because it tended to establish why the boys' natural mother may have suborned their testimony. The Court concluded that its exclusion unfairly prejudiced defendant's case resulting in error since "there [was] a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." *Helms* at 319, 367 S.E. 2d at 647, *quoting* G.S. sec. 15A-1443(a).

In reaching this conclusion, the Court reasoned that

[t]his evidence tends to support and make more plausible defendant's evidence that Diane Rogers [the natural mother] suborned the boys' testimony. Whatever antipathy might naturally exist between a natural mother and a stepmother would be exacerbated when the stepmother threatens the natural mother with loss of her children's custody.

. . . .

. . . The defense in this case was premised largely on the theory that Diane Rogers caused her sons to make up false charges against defendant. Such a theory, divorced from evidence that defendant and Richard Helms [the boys' father] were planning to institute a custody action against Diane Rogers, is not nearly so plausible as it would be in the presence of such evidence.

*Helms* at 319, 367 S.E. 2d at 647.

We find *Helms* distinguishable from the facts in the case *sub judice*. First, unlike the defendant in *Helms*, defendant's defense did not rest primarily upon the subornation theory. In *Helms*, several witnesses, including the boys' father, paternal grandfather, and their social worker, testified that on several separate occasions both boys stated that their natural mother had convinced them to fabricate these accusations. We have no such testimony in the case *sub judice* which would have raised the issue of subornation. In *Helms*, this theory was supported by evidence from other sources rather than from defendant alone, as in the instant case. Second, it is crucial to note that in the case at bar the investigation into the allegations of sexual abuse was initiated by a school counselor to whom daughter number two confided because she felt that she could not tell her mother, who had, according to defendant, planned the entire scheme. This fact alone is key in refuting defendant's theory and in rendering the evidence submitted in support thereof irrelevant. By contrast, in *Helms*, the natural mother initiated the investigation, thus rendering the theory more tenable and the evidence submitted in support thereof, relevant. Lastly, the evidence in the case *sub judice*, on the charge for which defendant was ultimately convicted, included a diary written by daughter number one several months earlier detailing the incidents of sexual abuse. The evidence in the instant case was more substantial than that in *Helms* and did not depend solely upon "which witnesses the jury [chose] to believe." *Id.*

Had the evidence met the G.S. sec. 8C-1, Rule 401 test of relevance, which we have concluded it did not, the directive of G.S. sec. 8C-1, Rule 403 would still have precluded its introduction. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues, or misleading the jury*, . . ." G.S. sec. 8C-1, Rule 403 (emphasis added). We believe that the evidence defendant sought to introduce, which primarily involved the couple's dispute over their marital property would only have muddled the evidence worthy of the jury's consideration. Therefore, for all the aforementioned reasons, we conclude that the trial court committed no error in precluding the introduction of evidence regarding defendant's theory that the victims' mother devised this scheme for her financial benefit.

[2] By his second and last Assignment of Error, defendant challenges the trial court's admission of Dr. Sultan's testimony and contends that it was protected by the psychologist-patient privilege. We disagree.

Defendant telephoned Dr. Sultan, a clinical psychologist, and made an appointment. When she recognized a conflict of interest because she was also treating defendant's wife and stepdaughters, she telephoned defendant to refer him to another psychologist. Defendant then stated to her that he had been seduced by his stepdaughter. The trial court allowed this testimony and compelled disclosure over defendant's objection on the basis that it was "necessary to [the] proper administration of justice" as allowed by G.S. sec. 8-53.3.

While we are not at all convinced that the psychologist-patient relationship existed at this point, *see State v. Mayhand*, 298 N.C. 418, 259 S.E. 2d 231 (1979); and *State v. Wade*, 197 N.C. 571, 150 S.E. 32 (1929), we are convinced that the trial court properly admitted the evidence. The second paragraph of G.S. sec. 8-53.3 (1988 Cum. Supp.), effective 8 June 1987, governs this case. It states the following:

Notwithstanding the provisions of this section, the psychologist-client privilege shall not be grounds for excluding evidence regarding the abuse or neglect of a child, or an illness of or injuries to a child, or the cause thereof, in any judicial proceeding related to a report pursuant to the Child Abuse Reporting Law, Article 44 of Chapter 7A of the General Statutes.

Therefore, the privilege, though properly overruled by the trial court, did not even exist as a proper ground for excluding the testimony. In fact, had the trial court excluded the evidence for this reason, it would have amounted to error.

It is for all the foregoing reasons that in the trial of defendant's case we find

No error.

Judges ARNOLD and PHILLIPS concur.